**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NEW SKIES SATELLITES, B.V., | |
| *Plaintiff,* | Civil Action No. 13-0200 (PGS) (TJB) |
| v. | |
| HOME2US COMMUNICATIONS, INC., | **OPINION** |
| *Defendant.* | |

**SHERIDAN, U.S.D.J.**

This matter comes before the Court on Plaintiff New Skies Satellites, B.V.'s ("New Skies" or "Plaintiff") Motion to Dismiss Defendant Home2US Communications, Inc.'s ("Home2US" or "Defendant") Counterclaim pursuant to FED. R. CIV. P. 12(b)(6) and/or FED. R. CIV. P. 9(b) and to Strike Defendant's Jury Demand (ECF No. 12). In its Complaint, Plaintiff alleges that Defendant defaulted under the terms of a satellite service agreement by failing to make timely and full payment of monthly service charges. Defendant now counterclaims that Plaintiff breached the contract and perpetrated fraud by failing to provide satellite service in accordance with the terms of the agreement. The Court decides this matter without oral argument pursuant to FED. R. CIV. P. 78(b). For the reasons set forth herein, Plaintiff's Motion to Dismiss Defendant's Counterclaim and Strike Defendant's Jury Demand is granted.

I.     BACKGROUND

       A. Parties

Plaintiff New Skies Satellites, B.V. ("New Skies") is a corporation organized under the laws of the Netherlands with a principal place of business in Princeton, New Jersey. (Compl. at ¶ 1). It operates a fleet of high-powered fixed satellites in the C-Band and Ku-Band which provide uplink and downlink capabilities for such services as voice, video, data, Internet, and satellite news gathering to a wide variety of customers in the domestic and international markets. (*Id.* at ¶ 5). Defendant Home2US Communications, Inc. ("Home2US") is a corporation organized under the laws of the State of Delaware with a principal place of business in Herndon, Virginia. (*Id*. at ¶ 2). Home2US is in the business of acquiring the rights to foreign television programs and channels from television broadcast operators and content producers and redistributing them via satellite to audiences in North and South America. (Def.'s Answer & Countercl. ("Countercl.") at ¶ 3). Home2US distributes this content either directly or through "sub-distribution" agreements with third-party cable-television and satellite platform operators. (*Id*.).

### B.  Factual Background

On or about March 4, 2004, Home2US entered into a Ku-Band Multiple Channel per Carrier ("MCPC") Global Service Agreement ("Global Service Agreement" or "GSA") with New Skies' predecessor-in-interest SES Americom, Inc. ("SES Americom" or "SES") to broadcast its television signals through SES-operated satellites to domestic service providers and end-users in North and South America. (Compl. at ¶ 6; Countercl. at ¶ 3). Over the next several years, as permitted under the terms of the GSA, Home2US entered into several Individual Service Description ("ISDs") agreements through which it obtained additional satellite transponder services.[1] (Compl. at ¶ 6). According to the Defendant, the contractual relationship between Home2US and SES Americom continued to develop "without major incident[]" until late 2007 or early 2008. (Countercl. at ¶ 6).

---

[1] For example, on or about September 17, 2009, Home2US entered into a Satellite Service Agreement with SES Americom Colorado, Inc. through which Home2US obtained additional satellite transponder services. (Compl. at ¶ 7).

In October 2007, however, the SES-operated satellite through which Home2US was broadcasting its television signals, identified as AMC-4, "began having technical issues[.]" (*Id*. at ¶ 7). According to the Defendant, "[b]etween 2008 and 2010, AMC-4 suffered a series of technical failures which in turn prevented Home2US from providing its content to its customers in an acceptable manner[.]" (*Id*.). As a result of these alleged failures, Home2US was forced to temporarily "migrate its services to [another satellite identified as] AMC-2 . . . [which was] used as an emergency spare back-up for AMC-4." (*Id*.). According to the Defendant, SES Americom was "aware of these satellite failures and its consequential interruption of service to Home2US" and both parties "were engaged in regular communication[s] in an effort to address the problems." (*Id*. at ¶ 8). In response to the technical issues involving AMC-4, SES Americom transitioned Home2US to a new satellite identified as SES-1. According to Home2US, the transition to "SES-1 resulted in significantly more service interruptions . . .[,] a smaller geographical area of coverage[,] . . . [and] and inferior link budget" compared to the service that had been provided using the AMC-4 satellite. (*Id*. at ¶ 9).

On or about December 23, 2009, SES Americom notified Home2US that effective January 1, 2010, it was assigning its interest in Home2US's obligations to New Skies. Under that assignment, the terms and conditions of the SES/Home2US agreements remained in full force and effect. (*Id*. at ¶ 2). Specifically, Home2US was required to make payment to New Skies no later than the first day of the month with late payments being subject to a 1.5 percent per month late fee. (Compl. at ¶ 13).

On or about June 9, 2010, after Home2US had demanded that New Skies take measures to address the issues arising from the transition to the SES-1 satellite, the two companies entered into an agreement whereby New Skies agreed to provide $1 million in "credits" to Home2US as "transition assistance[.]" (Countercl. at ¶ 15). According to the Defendant, one month later, on July

8, 2010, New Skies "attempted to force Home2US to sign a new one-sided agreement in which New Skies would avoid all liability[.]" (*Id*. at ¶ 17). Around this time, New Skies also allegedly contacted two customers with whom Home2US was negotiating contract renewals (BVN and The California Channel).

The Plaintiff presents a different version of the factual history for this time period. According to the Plaintiff, Home2US "defaulted under the terms of the Home2US Agreements when it failed to tender timely and full payment of the required monthly service charges starting in July 2010." (Compl. at ¶ 15). In an effort to "resolve Home2US's defaults and permit the continuation of service going forward, New Skies worked with Home2US to address the outstanding arrears and also permitted the termination of certain ISDs." (*Id*. at ¶ 16). According to the Plaintiff, "because New Skies was hopeful that Home2US would cure its arrears" New Skies also entered into a new ISD with Home2US in December 2011. (*Id*. at ¶ 17).

Between September 2011 and April 2012, Home2US made certain payments under the Home2US Agreements, however, according to the Plaintiff, Home2US "did not completely cure its default." (*Id*. at ¶ 18). After April 2012, Home2US made no additional payments. (*Id*. at ¶ 19). On September 4, 2012, New Skies sent a letter to Home2US advising the company that it remained in default and that $1,463,663.33 remained outstanding and overdue for services that New Skies had provided from July 2010 through September 2012. (*Id*. at ¶ 20). New Skies further advised Home2US that if full payment on all amounts due was not received within ten days of the date of the letter, New Skies would "exercise its rights to terminate the Home2US Agreements." (*Id*.). Failing to receive full payment by the deadline, New Skies terminated the Home2US Agreements by letter dated September 24, 2012. (*Id*. at ¶ 21).

4

On January 10, 2013, Plaintiff filed a two count Complaint in the United States District Court for the District of New Jersey. In Count One, Plaintiff asserts a breach of contract claim against Home2US. Specifically, Plaintiff contends that "Home2US is liable to New Skies for breaching the Home2US Agreements in the amount of at least $1,463,663.33 as of September 24, 2012, plus interest and attorneys' fees, for all charges that were due and owing as of the date of termination." (*Id*. at ¶ 23). In Count Two, Plaintiff alleges that "[u]pon termination, Home2US is liable . . . for the Termination Liability as defined in the Home2US Agreements [in] the approximate amount of $927,350.00[.]" (*Id.* at ¶ 26) Specifically, Plaintiff contends that Defendant is liable for the "net present value amount of monthly payments due for the remaining term of the Home2US Agreements plus late charges and interest[.]" (*Id*.).

On March 28, 2013, Defendant filed an Answer and Counterclaim to Plaintiff's Complaint. In Counterclaim One, Defendant alleges a breach of contract claim against New Skies. Specifically, Defendant argues that "SES and New Skies failed to provide [the promised] satellite services to Home2US when Home2US was assigned to satellite AMC-4, AMC-2 and after it was transitioned to SES-1." (Countercl. at ¶ 21). In Counterclaim Two, Defendant alleges a breach of the implied warranty of fitness for a particular purpose. According to the Defendant, "Home2US relied on the assurances, experience, and knowledge of SES and New Skies that it would be provided . . . services" and "SES and New Skies failed to provide [those] services[.]" (*Id*. at ¶¶ 25-26). In Counterclaim Three, Defendant asserts a lost profits claim. Specifically, Defendant argues that "[a]s a direct and proximate result of the failure to provide service by SES and New Skies, Home2US lost customers, opportunities for growth, and potential customers, resulting in damages and lost profits." (*Id*. at ¶ 32). Those losses allegedly included a decrease in annual revenue streams of between $2.5 million and $3.5 million and a loss of 60,000 Home2US customers. (*Id*. at ¶¶ 10, 13). In

Counterclaim Four, Defendant asserts that SES Americom or New Skies committed fraud by "offering and inducing Home2US to accept" changes to its services that resulted in "inferior and inadequate services" despite having given "assurances that [those] services would not be affected." (*Id*. at ¶ 35). Finally, in Counterclaim Five, Defendant asserts a tortious interference with prospective economic advantage claim against New Skies. On May 2, 2013, New Skies filed the instant Motion to Dismiss Defendant's Counterclaim.

## II.   DISCUSSION

### A.  Standard of Review

A motion to dismiss a counterclaim is properly evaluated under the familiar Rule 12(b)(6) standard. *RBC Bank (USA) v. Petrozzini*, 2012 U.S. Dist. LEXIS 75845, at *2 (D.N.J. May 31, 2012); *Malibu Media, LLC v. Lee*, 2013 U.S. Dist. LEXIS 72218, at *3 (D.N.J. May 22, 2013). FED. R. CIV. P. 12(b)(6) provides for the dismissal of a counterclaim if the counterclaimant "fail[s] to state a claim upon which relief can be granted[.]" When deciding a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), courts are required to "accept all factual allegations as true, construe the [counterclaim] in the light most favorable to the [counterclaimant], and determine whether, under any reasonable reading of the [counterclaim], the [counterclaimant] may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal citation and quotations omitted). In other words, "a [counterclaim] must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "The inquiry is not whether [a counterclaimant] will ultimately prevail in a trial on the merits, but whether [he or she] should be afforded an opportunity to offer evidence in support of [his or her] claims." *In re Rockefeller Ctr. Props., Inc.*, 311 F.3d 198,

215 (3d Cir. 2002). The Supreme Court has clarified, however, that "the tenet that a court must accept as true all of the allegations contained in a [counterclaim] is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Furthermore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citing *Twombly*, 550 U.S. at 555).

"To decide a motion to dismiss, courts generally consider only the allegations contained in the [counterclaim], exhibits attached to the [counterclaim] and matters of public record." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted). The court may consider "undisputedly authentic document[s] that . . . [are] attache[d] as an exhibit to a motion to dismiss if the [counterclaims] are based on the [attached] document[s]." *Id*. "[D]ocuments whose contents are alleged in the [counterclaim] and whose authenticity no party questions, but which are not physically attached to the pleading, may [also] be considered." *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002) (citation omitted); *see also U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002) ("Although a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the [counterclaim] may be considered without converting the motion to dismiss into one for summary judgment.") (internal citation omitted). The Court may not, however, "rely on other parts of the record in making its decision." *See Vartan v. Wells Fargo Bank Nw., N.A.*, 2012 U.S. Dist. LEXIS 54467, at *3 (M.D. Pa. Apr. 18, 2012) (citing *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994)).

To determine whether a counterclaim is plausible on its face, courts conduct a three-part analysis. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the court must "tak[e] note of the elements a [counterclaimant] must plead to state a claim." *Id.* (quoting *Iqbal*, 556

U.S. at 675). Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 131 (quoting *Iqbal*, 556 U.S. at 680). Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.* (quoting *Iqbal*, 556 U.S. at 680). This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. A counterclaim cannot survive where a court can only infer that a claim is merely possible rather than plausible. *Id.*

### B.  Home2US's Counterclaims Against New Skies

#### 1.  Counterclaim One: Breach of Contract

In Counterclaim One, Home2US alleges that New Skies breached the terms of the Global Service Agreement by refusing to declare AMC-4 a "Satellite Failure"[2] and failing to provide satellite services in accordance with the agreement. (Countercl. at ¶¶ 20-21). Plaintiff argues that the First Counterclaim should be dismissed because it is barred by the two-year limitations period contained in the Global Service Agreement. That provision provides, in relevant part:

> Any action of any kind by either Party arising out of this Agreement must be commenced within two (2) years from the date the right, claim, demand or cause of action shall first arise. (Countercl. at ¶ 1, Ex. A, Attach. A, art. 11).

Plaintiff relies on several of the allegations made in Defendant's Counterclaim to support its contention that Defendant's breach of contract claim is time-barred. For example, Defendant states that "SES and New Skies failed to provide satellite services to Home2US *when* Home2US was assigned to satellite AMC-4, AMC-2 and *after* it was transitioned to SES-1." (*Id.* at ¶ 21) (emphasis added). Furthermore, Defendant states that "[o]n or about July 8, 2010, it became clear to Home2US

---

[2] Under the Global Service Agreement, the term "Satellite Failure" is defined as a satellite: "(1) on which one or more of the basic subsystems fail, rendering the use of the satellite for its intended purposes impractical, as determined by SES Americom in its in its reasonable business judgment, or on which more than one-half of the transponders on the payload are transponder failures; and (2) that SES Americom has declared a failure." (Countercl. at ¶ 1, Ex. A, Attach. A, art. 2).

that New Skies was unreasonably refusing to declare AMC-4 a 'Satellite Failure' in an effort to avoid liability[.]"(*Id.* at ¶ 17). Based on these allegations, New Skies contends that any potential claims belonging to Home2US began to accrue as early as 2008 (when Home2US was first transferred to AMC-2) and as late as 2010 (when it became clear to Home2US that New Skies refused to declare AMC-4 a "Satellite Failure."). (Pl.'s Br. in Supp. of Mot. to Dismiss ("Pl.'s Br.") at 6-7). Plaintiff contends that because Defendant's Counterclaim was not filed until March 28, 2013, more than two years after either date of accrual, Home2US's claims are time-barred.

In opposition, Home2US argues that dismissal of its counterclaim based upon the two-year limitations period included in the GSA would be improper because the parties were still engaged in negotiations to resolve the technical issues up until, at least, August of 2012. (Def.'s Br. in Opp. to Pl.'s Mot. to Dismiss ("Def.'s Opp. Br.") at 1). According to the Defendant, the two-year limitations period should be equitably tolled and New Skies should be "equitably estopped from arguing [that] the statute of limitations clause is applicable when [New Skies] continued to negotiate with [Home2US] in order to facilitate its expiration." (*Id.* at 2). The Court will first consider the validity of the GSA's limitations provision and then address whether the negotiations between the parties entitle the Defendant to equitable tolling of the limitations period.

It is well settled that parties may contractually limit the time for bringing claims, despite a statute of limitations to the contrary. In *Order of United Comm. Travelers of Am. v. Wolfe*, 331 U.S. 586, 608, 67 S. Ct. 1355, 91 L. Ed. 1687 (1947), the Supreme Court held that "it is well established that, in the absence of a controlling statute to the contrary, a provision in a contract may validly limit, between the parties, the time for bringing an action on such contract to a period less than that prescribed in the general statute of limitations, provided that the shorter period itself shall be a reasonable period." New Jersey courts have come to a similar conclusion. In *Eagle Fire Prot. Corp.*

9

*v. First Indem. of Am. Ins. Co.*, 145 N.J. 345, 354, 678 A.2d 699 (N.J. 1996), the New Jersey Supreme Court held that a one year statute of limitations included in a surety bond, which limited New Jersey's six-year statute of limitations for bringing contract claims, was valid. The Court stated that "[c]ontract provisions limiting the time parties may bring suit have been held to be enforceable, if reasonable." *Eagle Fire Prot. Corp.*, 145 N.J. at 354; *see also A.J. Tenwood Assoc. v. Orange Senior Citizens House. Co.*, 200 N.J. Super. 515, 523, 491 A.2d 1280 (App. Div. 1985), *cert. denied*, 101 N.J. 325, 501 A.2d 976 (N.J. 1985) (noting that "[a]lthough the statutory limitation in this State for actions in contract is six years, N.J.S.A. 2A:14-1, such limitation may be waived by express agreement of the parties."). Accordingly, the Court finds that the GSA provision limiting the time for bringing an action to two years is both reasonable and valid.

Having determined that the GSA provision is valid, the Court must now consider whether the contractual two-year limitations period should be tolled due to the ongoing negotiations between the parties. Home2US argues that the Court should toll the two-year statute of limitations from 2008, when the technical issues with the AMC-4 satellite first arose, until August 2012, when negotiations between the parties to address these ongoing technical issues concluded. Under certain circumstances, negotiations between a claimant and a prospective defendant can provide a basis for tolling a statute of limitations. *See W.V. Pangborne & Co., Inc. v. N.J. Dep't of Transp.*, 116 N.J. 543, 556, 562 A.2d 222 (N.J. 1989) ("Courts have determined that through the process of negotiating, a defendant can intentionally lull a plaintiff into believing litigation is not necessary; a defendant in those circumstances may not take advantage of the protracted negotiations to have the statute of limitations run against the plaintiff's claim."). However, mere negotiations, without more, are insufficient to invoke equitable tolling. Home2US must allege and prove that SES Americom or New Skies engaged in inequitable conduct to lull Home2US into forgoing suit within the limitations

period in order to be entitled to equitable tolling for the period from 2008 until 2012. *See id.* at 553 (observing that "equitable estoppel has been used to prevent a defendant from asserting the statute of limitations when the defendant engages in conduct that is calculated to mislead the plaintiff into believing that it is unnecessary to seek civil redress."); *see also Eagle Fire Prot. Corp. v. First Indem. of Am. Ins. Co.*, 280 N.J. Super. 430, 441, 655 A.2d 939 (App. Div. 1995) ("The tolling of a contractual or statutory limitation due to conduct, requires some type of unconscionable conduct on the part of the [defendant] and not just mere negotiations or discussions."), *rev'd on other grounds*, 145 N.J. 345, 678 A.2d 699 (N.J. 1996).

While this Court is obligated to accept Defendant's well-pleaded allegations as true for purposes of Plaintiff's Motion to Dismiss, the Court will not accept bald assertions, unsupported conclusions, unwarranted references, or sweeping legal conclusions cast in the form of factual allegations. *See Iqbal*, 556 U.S. at 678-79. On the contrary, Home2US is obligated to set forth "factual content that allows the court to draw the reasonable inference that [New Skies] is liable for the misconduct alleged." *Santiago*, 629 F.3d at 128 (citation omitted). While detailed factual allegations are not necessary to survive a Rule 12(b)(6) motion, Defendant's "obligation to provide the grounds of [its] entitlement to relief requires more than labels[,] . . . conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Instead, Home2US must provide enough factual allegations "to raise a right to relief above the speculative level." *Id*. Here, the Court finds that Home2US fails to set forth any factual allegations to show that SES Americom or New Skies engaged in any inequitable conduct calculated to lull Home2US into forgoing suit within the limitations period. Rather, Home2US's allegations describe little more than "mere negotiations or discussions." As such, Home2US has failed to plead and prove that it is entitled to

equitable tolling. Accordingly, the Court finds that Defendant's First Counterclaim is barred by the two-year limitations period provided for in the GSA.[3]

While the Court finds that Defendant's breach of contract counterclaim is barred by the GSA limitations provision, the Court will dismiss that claim without prejudice to afford Home2US an opportunity to prove its entitlement to equitable tolling. The policy embodied in the Federal Rules of Civil Procedure favors discovery in learning whether any evidence exists to demonstrate inequitable conduct on the part of SES Americom or New Skies. *See Caldwell Trucking PRP Group v. Spaulding Composites, Co.,* 890 F. Supp. 1247, 1252 (D.N.J. 1995) ("Since the long-established federal policy of civil litigation is to decide cases on the proofs, district courts generally disfavor Rule 12(b)(6) motions."). Discovery relating to the limitations issue shall be limited to facts surrounding the negotiations with SES Americom or New Skies that allegedly lulled Home2US into forgoing suit. Should Defendant wish to proceed with its breach of contract claim after such discovery, Defendant may file an Amended Counterclaim clearly identifying the inequitable conduct that forms the basis of its equitable tolling argument.

## 2. Counterclaim Two: Breach of Implied Warranty of Fitness for a Particular Purpose

In Counterclaim Two, Home2US alleges that New Skies breached the implied warranty of fitness for a particular purpose by "fail[ing] to provide satellite services to Home2US as required when Home2US was assigned to satellite AMC-4, AMC-2 and after it was transitioned to SES-1." (Countercl. at ¶¶ 27-28). Plaintiff argues that Defendant's Second Counterclaim should be dismissed for two reasons. First, Plaintiff contends that the breach of implied warranties claim is barred by the two-year limitations period imposed by the Global Service Agreement. Second, Plaintiff contends

---

[3]The Court's finding does not preclude Home2US from later asserting the affirmative defense of a set-off, which it pled in its Answer to News Skies' Complaint. (*See* Def.'s Answer & Countercl. at ¶ 17).

that the counterclaim must fail because the New Jersey Uniform Commercial Code ("NJ U.C.C.") does not apply to contracts for services. The Court will address both of these arguments in turn.

Home2US's claim for breach of implied warranties is based on the same factual allegations giving rise to its breach of contract claim in Counterclaim One. Having already determined that the breach of contract claim is barred by the two-year limitations period imposed by the Global Service Agreement, the Court finds that Defendant's Second Counterclaim is also time-barred.

In addition to being barred by the limitations period set forth in the Global Service Agreement, the Court finds that the contract between Home2US and New Skies was a services contract not subject to the implied warranties of the NJ U.C.C. The Third Circuit has clearly stated that "[t]he commercial warranty provisions found in Article Two of the U.C.C. apply only to 'transactions in goods[.]'" *Paramount Aviation Corp. v. Gruppo Agusta*, 288 F.3d 67, 72 (3d Cir. 2002) (citing N.J.S.A. 12A:2-102). Moreover, the implied warranty of fitness for a particular purpose, which is a cause of action arising under the NJ U.C.C., provides that such a warranty is implied only "[w]here the seller at the time of contracting has reason to know any particular purpose for which the *goods* are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable *goods*[.]" N.J.S.A. 12A:2-315 (emphasis added). The term "goods" is defined in the NJ U.C.C. as "all things . . . which are movable at the time of identification to the contract for sale other than money in which the price is to be paid, investment securities . . . and things in action." N.J.S.A. 12A:2-105.

Here, the record indicates that the agreement between Home2US and New Skies was for services. As an initial matter, the agreement itself is called a "Global Service Agreement." (Countercl. at ¶ 1, Ex. A). The language used throughout the Agreement indicates that it is a contract

for services and does not refer in any way to a transaction in "goods." For example, Section One of the contract, entitled "Service," provides:

> SES Americom will provide to [Home2US] full-time compressed digital video Ku-Band Transponder Protected Channel services on SES Americom's Ku-Band Multiple Channel per Carrier ("MCPC") Digital Compression Platform on the AMC-4 Satellite (the "Service"). Service will be provided in accordance with the terms and conditions set forth in this Agreement. (*Id*.).

Home2US's own characterization of the contract between it and New Skies also supports the conclusion that any contract between the two was a services contract. For example, Home2US states in its Counterclaim that New Skies "was to provide Home2US Satellite transponder and platform services." (Countercl. at ¶ 1). Home2US describes its business as "acquiring the rights to foreign television programs and/or channels from television broadcast operators as well as content producers to re-distribute them via satellite and other delivery methods to their intended target audiences in North [and] South America[]." (*Id*. at ¶ 3). Even within its Second Counterclaim, Home2US states that "[it] relied on the assurances, experience and knowledge of SES and New Skies that it would be provided . . . services in an efficient manner" and "SES and New Skies failed to provide satellite services[.]" (*Id*. at ¶¶ 25, 27). Because Home2US's Second Counterclaim is based on a contract for services, the U.C.C. does not govern and no claim for breach of the implied warranty of fitness for a particular purpose can stand. Moreover, the Global Service Agreement expressly prohibits such claims between the parties. Article 8 of the Agreement explicitly states: "No warranties, expressed, implied, or statutory, including any warranty of merchantability or fitness for a particular purpose, apply to the Service or the equipment and facilities used to provide the Service." (*Id*. at ¶ 1, Ex. A, Attach. A, art. 8). Accordingly, the Court will dismiss Defendant's Second Counterclaim with prejudice.

### 3.   Counterclaim Three: Lost Profits

In Counterclaim Three, Defendant asserts an independent cause of action for "lost profits." Specifically, Defendant contends that "[a]s a direct and proximate result of the failure to provide service by SES and New Skies, Home2US lost customers, opportunities for growth, and potential customers, resulting in damages and lost profits." (*Id*. at ¶ 32). Plaintiff argues that Home2US's Third Counterclaim for "lost profits" must be dismissed because "it is a remedy and not a valid, independent cause of action." (Pl.'s Br. at 11). The Court agrees with Plaintiff that no cause of action for lost profits exists and that this is simply a measure of damages that may be available under one of Defendant's other theories of liabilities. As this Court has previously explained:

> [D]amage theories and causes of action are separate concepts which should not be confused. Damages are "pecuniary compensation or indemnity, which may be recovered in the courts by any person who has suffered loss, detriment, or injury, whether to his person, property, or rights, through the unlawful act or omission or negligence of another." Damages may be categorized or "theorized" as, *inter alia*, actual, compensatory, consequential, punitive, expectancy, future, hedonic, incidental, liquidated, rescissory, special, or speculative. Causes of actions, by contrast, encompass "[a] situation or state of facts which would entitle [a] party to sustain [an] action and give him [the] right to seek a judicial remedy in his behalf." *Lithuanian Comm. Corp. v. Sara Lee Hosiery*, 2002 U.S. Dist. LEXIS 15038, at *8-9 (D.N.J. Feb. 13, 2002) (quoting BLACK'S LAW DICTIONARY 389 (6th Ed. 1990).

Given this distinction, the Court will dismiss Defendant's Third Counterclaim with prejudice while recognizing that doing so does not proscribe Defendant from later asserting a lost profits theory of damages should it wish to proceed on those counterclaims which the Court is dismissing without prejudice. The Court notes, however, that Defendant's likelihood of recovery is dubious based on Article 8 of the Global Service Agreement which states that "SES Americom . . . will not be liable for . . . loss of actual or anticipated revenues or profits, [or] loss of business, customers or good will[.]"  (Countercl. at ¶ 1, Ex. A, Attach. A, art. 8).

### 4.  Counterclaim Four: Fraud

In Counterclaim Four, Defendant asserts a claim of common law fraud against New Skies.[4] According to the Defendant, New Skies "committed fraud by offering and inducing Home2US to accept . . . changes [to its services] with assurances that [the quality of] its services would not be affected." (Countercl. at ¶ 35). Plaintiff argues that Defendant's Fourth Counterclaim should be dismissed for two reasons. First, Plaintiff contends that the common law fraud claim is barred by the two-year limitations period imposed by the Global Service Agreement. Second, Plaintiff contends Home2US has failed to plead the elements of common law fraud with sufficient particularity to satisfy the heightened pleading requirements imposed by FED. R. CIV. P. 9(b).

In its Opposition, Home2US more clearly identifies the allegedly fraudulent actions by New Skies giving rise to its fraud claim. Specifically, Home2US contends that New Skies committed fraud by: (1) knowingly misrepresenting its intent to declare a satellite a "Satellite Failure" under certain circumstances; (2) knowingly misrepresenting that its satellites would meet the requirements of Home2US's business; and (3) knowingly misrepresenting that Home2US would receive a $1,000,000 credit for services provided. (*Id*. at 5-8). All three of these alleged events occurred more than two years prior to Defendant's filing of its Counterclaim. As the Court has already determined that the two-year limitations period imposed by the Global Service Agreement is both reasonable and valid, the Court finds that Defendant's Fourth Counterclaim is also time-barred.

In addition, after accepting the allegations in the Counterclaim as true and construing the facts in the light most favorable to the Defendant, the Court finds that Home2US has failed to sufficiently allege a claim of common law fraud against New Skies. In order to state a claim for

---

[4] In its Counterclaim, Defendant also asserts that Plaintiff's actions constituted a violation of the New Jersey Consumer Fraud Act ("NJCFA"). (Counter. at ¶ 36). In its Opposition Brief, however, Home2US concedes "that it cannot bring a cause of action under the New Jersey Consumer Fraud Act for this type of transaction." (Def.'s Opp. Br. at 5). Accordingly, to the extent that Home2US's Fourth Counterclaim is based on New Skies having violated the New Jersey Consumer Fraud Act, that claim is dismissed with prejudice.

common law fraud, a plaintiff must allege "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages. *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610, 691 A.2d 350 (N.J. 1997) (citing *Jewish Ctr. of Sussex Cnty. v. Whale*, 86 N.J. 619, 624-25, 432 A.2d 521 (N.J. 1981)). Here, Home2US does not plead any facts suggesting that New Skies knew, at the time it entered into the Global Service Agreement, that it would either (1) unreasonably refuse to declare AMC-4 a "Satellite Failure" at some point in the future or (2) experience technical issues with its satellites that would inhibit its ability to provide service to Home2US. According to the Defendant, "[p]rior to 2008, Home2US and SES were working together without major incidents and Home2US was growing at a steady rate[.]" (Countercl. at ¶ 6). Such an allegation leads this Court to conclude that the technical issues which plagued the satellites were unanticipated and that New Skies was performing in accordance with the terms of the Global Service Agreement. Home2US also fails to set forth facts showing that New Skies intended for Home2US to rely upon its alleged misrepresentations or that Home2US did in fact reasonably rely upon those misrepresentations. As such, Home2US has not set forth "enough facts to state a claim to relief that is plausible on its face." *See Twombly*, 550 U.S. at 570. The Court will therefore dismiss Defendant's Fourth Counterclaim without prejudice. Should Defendant wish to proceed with its common law fraud claim, Defendant shall (1) present sufficient evidence demonstrating its entitlement to a tolling of the two-year limitations period and (2) plead with particularity the circumstances which form the basis of its fraud claim.

### 5. Counterclaim Five: Tortious Interference with Prospective Economic Advantage

In Counterclaim Five, Defendant asserts a tortious interference with prospective economic advantage claim against New Skies. In describing the alleged conduct giving rise to its claim,

Defendant states that New Skies interfered with Home2US's prospective economic advantage by: (1) being "responsible for the technical difficulties" associated with the satellites; (2) "enter[ing] . . . a field of service they had never done before[]"; and (3) "engaging [Home2US's] existing clients to steal existing and viable future business." (Countercl. at ¶ 39). Plaintiff argues that Defendant's Fifth Counterclaim should be dismissed because the claim is barred by the Global Service Agreement's two-year limitations period and because Defendant has failed to plead sufficient facts to establish a *prima facie* case for tortious interference.

Defendant's Counterclaim indicates that Home2US's tortious interference claim is based on New Skies allegedly contacting two of Home2US's customers with whom it was negotiating contract renewals in or about July 2010. (*Id*. at ¶ 18). Because Plaintiff did not file its Counterclaim until March 28, 2013, more than two years after the allegedly tortious conduct undertaken by the Plaintiff, the Court finds that Defendant's Fifth Counterclaim is barred by the two-year limitations provision in the Global Service Agreement.

In addition, the Court agrees with Plaintiff's argument that Defendant has failed to establish a *prima facie* case of tortious interference with prospective economic advantage. To state a claim for tortious interference with prospective economic advantage under New Jersey law, a plaintiff must allege: "(1) a reasonable expectation of economic advantage from a prospective contractual or economic relationship; (2) the defendant intentionally and maliciously interfered with the relationship; (3) the interference caused the loss of the expected advantage; and (4) actual damages resulted. *Am. Leistritz Extruder Corp. v. Polymer Concentrates, Inc.*, 363 Fed. Appx. 963, 967 (3d Cir. 2010); *accord Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 563 A.2d 31, 37 (N.J. 1989). For purposes of this tort, "malice is defined to mean the harm was inflicted intentionally and without justification or excuse." *Printing Mart-Morristown*, 116 N.J. at 751 (citing *Rainier's*

*Dairies v. Raritan Valley Farms, Inc.*, 19 N.J. 552, 563, 117 A.2d 889 (N.J. 1955)). While Defendant alleges that New Skies contacted BVN and The California Channel "with the intention of destroying both existing and prospective, viable contracts[,]" it fails to present facts suggesting that New Skies did so with the specific intent of convincing those customers to decline renewal of their contracts. In fact, Defendant's Counterclaim fails to allege any facts suggesting the substance of the conversations between New Skies and those customers. Moreover, Defendant fails to produce any evidence indicating a reasonable probability that BVN and The California Channel would have renewed their contracts with Home2US in the absence of New Skies' alleged interference. *See Printing Mart-Morristown*, 116 N.J. at 759 ("A plaintiff shows causation when there is proof that if there had been no interference there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits.") (citations and quotations omitted). Defendant's tortious interference with prospective economic advantage counterclaim, in the opinion of this Court, relies solely on a "formulaic recitation of the elements of [the] cause of action," and therefore, cannot survive Plaintiff's Motion to Dismiss. For these reasons, and the fact that Home2US has not opposed New Skies' Motion with respect to the Fifth Counterclaim, the Court will dismiss Defendant's Fifth Counterclaim with prejudice.

### C.  New Skies' Motion to Strike Home2US's Jury Demand

New Skies also moves to strike Home2US's jury demand pursuant to a provision of the Global Service Agreement entered into by the parties. Article 11 of the Global Service Agreement provides, in relevant part: "Each of the Parties hereby irrevocably waives (and agrees not to assert) the right to trial by jury[.]" (Countercl. at ¶ 1, Ex. A, Attach. A, art. 11). Where, as here, a federal action is premised upon diversity jurisdiction, the right to a jury trial in federal court presents a question of federal law. *Simler v. Conner*, 372 U.S. 221, 222, 83 S. Ct. 609, 9 L. Ed. 2d 691 (1963);

*In re City of Phila. Litig.*, 158 F.3d 723, 726 (3d Cir. 1998). "Although the right to a jury trial is guaranteed by the Seventh Amendment to the United States Constitution, like all constitutional rights it can be waived by the parties." *In re City of Phila. Litig.*, 158 F.3d at 726. To be valid, a contractual waiver of the right to a jury must be voluntary and knowing. *First Union Nat'l Bank v. United States*, 164 F. Supp. 2d 660, 663 (E.D. Pa. 2001). The following factors guide a court's determination of whether a contractual provision waiving the right to a jury is valid: "(1) there was no gross disparity in bargaining power between the parties, (2) the parties are sophisticated business entities, (3) the parties had an opportunity to negotiate the contract terms, and (4) the waiver provision was conspicuous." *Id.*; *Titan Stone, Tile & Masonry, Inc. v. Hunt Const. Group, Inc.*, 2007 U.S. Dist. LEXIS 4661, at *4 (D.N.J. Jan. 22, 2007). Here, both parties are sophisticated business entities, the waiver provision in the Global Service Agreement is conspicuous, and the parties had an opportunity to negotiate the terms of the agreement. In addition, Home2US has not asserted any basis, in either its Counterclaim or Opposition to Plaintiff's Motion, as to why the jury waiver provision contained in the Global Service Agreement is invalid. Accordingly, Plaintiff's Motion to Strike Defendant's Jury Demand is granted and the jury demand asserted by Home2US in its Answer and Counterclaim is hereby stricken.

## III.   CONCLUSION

For the reasons set forth above, Plaintiff's Motion to Dismiss Defendant's Counterclaim is granted and Plaintiff's Motion to Strike Defendant's Jury Demand is granted. An appropriate Order follows.


Date: March 28, 2014                         *s/Peter G. Sheridan*
                                              PETER G. SHERIDAN, U.S.D.J.

20